IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MELANIE EDWARDS (02),<br><br>Defendant. | CR. NO. 19-00038  JMS (02)<br><br>ORDER DENYING DEFENDANT'S SECOND MOTION TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i), ECF NO. 113 |

## ORDER DENYING DEFENDANT'S SECOND MOTION TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i), ECF NO. 113

## I.  INTRODUCTION

Before the court is Defendant Melanie Edwards' ("Defendant") "Second Motion to Reduce Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i)" filed on October 25, 2022, ECF No. 113 ("Motion to Reduce Sentence").[1] Defendant claims that her serious medical conditions, to which the COVID-19 vaccine is purportedly contraindicated, constitute extraordinary and compelling reasons justifying reduction of her sentence.  Defendant's health conditions, while serious, are not extraordinary and compelling reasons warranting the requested relief at this time.  Moreover, the court's analysis of the 18 U.S.C. § 3553(a)

---

[1] Defendant withdrew her first motion to reduce sentence.  *See* ECF Nos. 96 and 97. Nonetheless, the court has jurisdiction to consider successive motions for compassionate release under 18 U.S.C. § 3582(c).  *See United States v. Trujillo*, 713 F.3d 1003, 1007 (9th Cir. 2013).

factors favors continued incarceration.  Accordingly, for the reasons stated below, Defendant's Motion to Reduce Sentence, ECF No. 113, is DENIED WITHOUT PREJUDICE.

## II.  **BACKGROUND**

Defendant is 64-years old and located at Federal Correctional Institution Victorville Medium I ("VIM"), with a projected release date of November 7, 2024.  *See* Find an Inmate, https://www.bop.gov/inmateloc/ (last visited December 28, 2022).

On February 7, 2020, the court sentenced Defendant to 30 months imprisonment, three years of supervised release, $5,223,268.69 restitution, and a $100 special assessment.  ECF No. 53.  After numerous extensions due to health complications and the COVID-19 pandemic, Defendant did not self-surrender until September 23, 2022.  *See* ECF No. 113 at PageID.812; *see also, e.g.*, ECF Nos. 79, 98, 100, 104, 107.  Once at VIM, Defendant immediately requested a reduced sentence based on her medical conditions.  *See* ECF No. 113-1.  After serving only one month, on October 25, 2022, Defendant filed the instant Motion to Reduce Sentence.  ECF No. 113.  The government filed its response on November 15, 2022.  ECF No. 118.  Defendant filed a Reply on November 30, 2022.  ECF No. 119.  Defendant filed additional exhibits in support on December 14, 2022.  ECF Nos. 124, 127.  The government filed a Supplemental Memorandum in Opposition

on December 15, 2022.  ECF No. 128.  In the interim, on November 16, 2022, the warden denied Defendant's September 23, 2022 request.[2]  ECF No. 128-1.

Defendant asserts that her medical conditions constitute extraordinary and compelling circumstances warranting a reduced sentence to time served and immediate release to home confinement as a condition of supervised release.  ECF No. 113 at PageID.811.  Defendant suffers from idiopathic thrombocytopenic purpura ("ITP"),[3] anxiety and depression, carotid stenosis, stage 3 chronic kidney disease, chronic fatigue, coronary artery disease, fibromyalgia, hypertension, heart palpitations, morbid obesity, and sleep apnea.  *Id*. at PageID.813; *see also* ECF No. 117 (medical records).  There is no dispute that Defendant has satisfied the administrative exhaustion requirement under 18 U.S.C. § 3582(c)(1)(A).  *See* ECF No. 118 at PageID.911.  The court decides the Motion to Reduce Sentence without a hearing pursuant to Local Rule 7.1(c).

---

[2] The warden found no "extraordinary or compelling circumstances," *see* ECF No. 128-1 at PageID.1119, and Defendant did not "provide any information to indicate that [she is] currently suffering from a debilitated medical condition or terminal medical condition . . . ."  *Id*.  The warden acknowledged that Defendant has "a diagnosis of obesity, major depressive disorder, anxiety, [and] 'heart disease, UNS carotid stenosis s/p right endardectomy,'" but that her record did not indicate that she had "a diagnosis of 'stage three kidney failure, chronic fatigue, idiopathic thrombocytopenic purpura, hypertension or sleep apnea.'"  *Id*.  The warden also stated that Defendant's request did not include any medical documentation to assert the claim of having these diagnoses.  *Id*.  Both parties have since submitted numerous medical records to this court in support of their positions.

[3] ITP is a type of platelet disorder in which the blood does not clot normally due to a low platelet count.  *See* Immune Thrombocytopenia (ITP), https://www.nhlbi.nih.gov/health/immune-thrombocytopenia (last visited December 28, 2022).

# III. DISCUSSION

## A.    Legal Standard

Ordinarily, "a federal court 'may not modify a term of imprisonment once it has been imposed.'"  *United States v. Wright*, 46 F.4th 938, 944 (9th Cir. 2022) (quoting *United States v. Keller*, 2 F.4th 1278, 1281 (9th Cir. 2021), and 18 U.S.C. § 3582(c)).  Congress created a limited exception for modifying the sentence of a federal inmate who files a motion for "compassionate release" satisfying the substantive and procedural requirements of 18 U.S.C. § 3582(c)(1)(A).  *See Wright*, 46 F.4th at 944.  Section 3582(c)(1)(A), as amended by the First Step Act of 2018 ("FSA"), provides in relevant part:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . after considering the factors set forth in [18 U.S.C.] section 3553(a) to the extent that they are applicable, if it finds that—
> (i) extraordinary and compelling reasons warrant such a reduction;
>
> . . . .
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

4

"As compassionate release derogates from the principle of finality, it is a 'narrow' remedy . . . and the court's disposition of a compassionate release motion 'is discretionary, not mandatory[.]'" *Wright*, 46 F.4th at 944–45 (internal citations omitted).  And although the court must consider "extraordinary and compelling" reasons, the applicable policy statements by the Sentencing Commission, and § 3553(a) factors, it may deny compassionate release on any of these bases:

> First, the district court must determine whether "extraordinary and compelling reasons warrant" a sentence reduction.  Second, the court must evaluate whether a reduction would be "consistent with applicable policy statements issued by the Sentencing Commission."  Third, the court must consider and weigh the factors set forth in 18 U.S.C. § 3553(a) to decide whether the requested sentence reduction is warranted "under the particular circumstances of the case."  Although a district court must conclude that a defendant satisfies all three predicates before granting a motion for compassionate release, it may deny compassionate release if a defendant fails to satisfy any of these grounds.

*Id*. at 945 (internal citations and footnote omitted).

Although § 3582(c)(1)(A) requires a sentence reduction to be "consistent with applicable policy statements issued by the [United States] Sentencing Commission," that requirement does not apply to this case, as there is currently no policy statement from the Sentencing Commission that is "applicable" to compassionate release motions filed by a defendant rather than by the Federal Bureau of Prisons ("BOP") Director.  *See Wright*, 46 F.4th at 946.  Specifically,

5

the Sentencing Commission's policy statement, United States Sentencing Guideline ("Guideline") § 1B1.13, was promulgated before the FSA provided criminal defendants the ability to file motions for compassionate release on their own behalf. *See United States v. Aruda*, 993 F.3d 797, 800 (9th Cir. 2021) (per curiam). The Sentencing Commission has not amended the Guidelines post-FSA. *Id.* at 800 n.1. This court is thus empowered to consider any extraordinary and compelling reason that warrants a sentence reduction. *See id.* at 801–02. In making this determination, "[t]he Sentencing Commission's statements in [§ 1B1.13] may inform a district court's discretion for § 3582(c)(1)(A) motions filed by a defendant, but they are not binding." *Id.* at 802.

The Ninth Circuit in *Keller*, after *Aruda*, further clarified the scope of the district court's discretion, holding that a district court may deny a compassionate release motion solely based on defendant's failure to show an "extraordinary and compelling" reason for release. "[A] district court that properly *denies* compassionate release need not evaluate each step" in the "sequential step-by-step analysis" required by 18 U.S.C. § 3582(c)(1)(A). *Keller*, 2 F.4th at 1284. "Such a reading is compelled by the structure of the compassionate release statute, which treats its requirements as conjunctive." *Wright*, 46 F.4th at 947 (citing *Keller*, 2 F.4th at 1284). "This structure necessarily dictates that a court may deny

compassionate release at *any* stage of the § 3582(c)(1)(A) pipeline." *Id*. (emphasis added).

## B.    Extraordinary and Compelling Reasons

Defendant bears the burden of establishing extraordinary and compelling reasons warranting compassionate release. *See Wright*, 46 F.4th at 951; *United States v. Bogema*, 2020 WL 6150467, at *3 (D. Haw. Oct. 20, 2020). At this juncture, Defendant has not done so.

Defendant's healthcare provider, Kristine Carter, NP, advised in a July 2021 letter that Defendant's numerous health problems "keeps her in a very vulnerable state" and that "[i]f she were to contract COVID19 it would most likely be fatal." ECF No. 117-1 at PageID.855. Nurse Carter's view was that Defendant's health status "also precludes her from receiving the current vaccines for COVID19." *Id*. Four months later, Nurse Carter commented in a November 2021 office visit note that she "discussed the importance of COVID-19 vaccine" with Defendant, *id*. at PageID.875. Nonetheless, Defendant refused the vaccine when offered by the BOP one year later in November 2022 because she had "been advised by [her] Dr. due to ITP not to have vaccine." ECF No. 118-3.

During the COVID-19 pandemic, federal inmates have filed compassionate release motions grounded on a perceived risk of contracting severe illness while incarcerated. The COVID-19 pandemic alone, however, does not

constitute an extraordinary and compelling reason for release.  *See, e.g.*, *United States v. Drummondo-Farias*, 460 F. Supp. 3d 1008, 1014 (D. Haw. 2020) (explaining that "'[g]eneral concerns about possible exposure to COVID-19 does not meet the criteria for extraordinary and compelling reasons for a reduction in sentence set forth in the Sentencing Commission's policy statement" (quoting *United States v. Eberhart*, 448 F. Supp. 3d 1086, 1090 (N.D. Cal. 2020)); *see also United States v. Brooks*, 491 F. Supp. 3d 33, 37 (W.D. Pa. 2020); *United States v. Mitchell*, 471 F. Supp. 3d 1130, 1138 (W.D. Wash. 2020).

Despite inmates' legitimate concerns, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread."  *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020).  The CDC reports that vaccinated individuals are much less likely to experience severe symptoms than people who are unvaccinated:

> COVID-19 vaccines help protect against severe illness, hospitalization and death.  COVID-19 vaccines also help protect against infection.  People who are vaccinated may still get COVID-19.  When people who have been vaccinated get COVID-19, they are much less likely to experience severe symptoms than people who are unvaccinated. . . .

*See* COVID-19 after Vaccination: Possible Breakthrough Infection, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/effectiveness/why-measure-

effectiveness/breakthrough-cases.html (last visited December 28, 2022).

Accordingly, if a defendant is fully vaccinated against COVID-19,[4] the defendant's

risk of symptomatic infection is greatly diminished, making it much more difficult

for the defendant to demonstrate an "extraordinary and compelling" reason to

justify release.  *See, e.g.*, *United States v. Hayes*, 2021 WL 2533517, at *3 (D.

Idaho June 21, 2021) ("Many courts have found that a vaccinated prisoner's risk of

contracting COVID-19 does not rise to the level of an extraordinary and

compelling reason, even in the presence of underlying health conditions."); *United

States v. Del Rosario Martinez*, 524 F. Supp. 3d 1062, 1066–67 (S.D. Cal. 2021)

("Defendant's 'vaccination significantly mitigates the risk that [he] will contract

COVID-19' . . . .") (quoting *United States v. Grummer*, 2021 WL 568782, at *2

(S.D. Cal. Feb. 16, 2021))).  The BOP currently reports that VIM has one staff

member and two inmates with confirmed cases of COVID-19.  *See* COVID-19

Cases, https://www.bop.gov/coronavirus/index.jsp (last visited December 28,

2022).

   As for refusing an available vaccine, district courts in the Ninth

Circuit, including this District, have determined that "an inmate's refusal of a

---

[4] The CDC defines "fully vaccinated people" as those "who have received the second dose in a two-dose COVID-19 vaccine primary series."  *See* Data Definitions for COVID-19 Vaccinations in the United States, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/ reporting-vaccinations.html (last visited December 28, 2022).

COVID-19 vaccination undercuts that inmate's assertion of extraordinary and compelling circumstances justifying compassionate release." *United States v. Nino*, 2022 WL 19649, at * 4 (D. Haw. Jan. 3, 2022) (denying compassionate release to inmate who refused the COVID-19 vaccine due to his failure to fulfill his burden to justify compassionate release); *see also, e.g.*, *United States v. Moore*, 2021 WL 3666319, at *3 (D. Ariz. Aug. 18, 2021) (disallowing the defendant "to create an increased risk to himself—and therefore try to conjure an 'extraordinary and compelling' circumstance—by declining [the COVID-19 vaccine,] a readily available and overwhelmingly significant preventative measure"); *United States v. Rennie*, 2021 WL 5053286, at *2 (D. Or. Nov. 1, 2021) ("The Ninth Circuit, however, has made clear that pre-existing medical conditions that add an increased risk of complications from COVID-19 do not necessarily present 'extraordinary and compelling' circumstances warranting compassionate release, even when a defendant is housed in a facility where inmates have tested positive for COVID-19.") (collective cases); *United States v. Chambers*, 2021 WL 4951444, at *4 (N.D. Cal. Oct. 25, 2021) (concluding that the health status of inmate, who initially refused a COVID-19 vaccine, does not constitute extraordinary and compelling circumstances warranting release and that "[w]hile the COVID-19 vaccines may not provide absolute protection against all infections, the evidence so far shows that they do provide significant protection against severe illness and death resulting

from the coronavirus") (citations omitted), *aff'd*, No. 21-10319, 2022 WL 3010174 (9th Cir. July 29, 2022) (mem.); *United States v. Allen*, 2022 WL 540805, at *3 (D. Idaho Feb. 22, 2022) (recognizing that inmate's age and underlying heart and coronary conditions place him at an increased risk of severe illness from COVID-19, but denying compassionate release because inmate's initial refusal to be fully vaccinated weighs heavily against a finding of extraordinary and compelling circumstances).  Undisputedly, Defendant suffers from numerous health conditions, which the court addresses in turn.

Defendant's most serious condition is ITP, a chronic auto-immune condition that is "incapacitating" when not in remission, causing chronic fatigue and a compromised immune system.  ECF No. 117-1 at PageID.854.  Defendant has had ITP from age 19, *id*. at PageID.852, there is no cure, and the condition is "exacerbated by stress or any additional outside illness, such as the flu, bronchitis, physical shock, or other triggering health disturbance."  *Id*. at PageID.854. Defendant's ITP and fatigue have worsened over the past few years and drastically affect her sleep pattern such that she cannot sleep at night but sleeps throughout the day.  *Id*.; *see also id*. at PageID.856.  This affects Defendant's ability to function during the day, *id*. at PageID.852, and she relied solely on her husband to perform activities of daily living in addition to providing her care "physically, financially, emotionally, and socially."  *Id*. at PageID.857.

11

Defendant asserts that the BOP did not provide her with any information about the vaccine's specific appropriateness for her given medical issues, ECF No. 119 at PageID.967.  However, Defendant's signature appears on the COVID-19 Vaccine Consent, ECF No. 118-3, demonstrating that she "had the opportunity to ask questions about the benefits and risks of vaccination, including if I . . . have a weakened immune system . . . ." *Id*.  Furthermore, as outlined below, guidance from the American Society of Hematology ("ASH") and the Platelet Disorder Support Association ("PDSA") suggests that those with existing ITP should be vaccinated.

In February 2022, the PDSA Medical Advisory Board published that "the risks related to ITP . . . and bleeding following SARS-CoV-2 vaccination in persons with and without pre-existing ITP . . . are very low," ECF No. 118-4 at PageID.940, and that it "has and continues to strongly recommend that everyone should receive vaccination for COVID-19 unless there is a rare, obvious, medical contraindication." *Id*. at PageID.941.  Also, "[i]t is very clear that COVID-19 is sufficiently deadly and vaccines are so effective, that the benefit of vaccination vastly outweighs the risks, including . . . worsening of a pre-existing ITP." *Id*.; *see also* COVID-19 and vaccines and ITP, https://pdsa.org/covid-19#covid-vaccine (last visited December 28, 2022).  The ASH similarly advised as far back as April 2021 that "the expected benefits of receiving . . . [the COVID-19] vaccine likely

outweigh [the concern of a drop in the platelet count] . . . ." and that "the risks associated with COVID-19 disease appear to outweigh the risks associated with [COVID-19] vaccination in ITP patients."  ECF No. 118-5 at PageID.951; *see also* COVID-19 and ITP: Frequently Asked Questions, https://www.hematology.org/covid-19/covid-19-and-itp (last visited December 28,2022) (same).

The Centers for Disease Control and Prevention ("CDC") acknowledge that individuals with a weakened immune system are at increased risk of severe COVID-19 illness and death and that "the immune response to COVID-19 vaccination may not be as strong as in people who are not immunocompromised."  *See* COVID-19 Vaccines for People Who Are Moderately or Severely Immunocompromised, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/recommendations/immuno.html (last visited December 28, 2022). Nonetheless, contrary to Defendant's belief, the CDC advises that protection for immunocompromised individuals is optimized when they stay up to date with COVID-19 vaccines.  *Id*.   Thus, although ITP is a serious condition, COVID-19 vaccination is not completely contraindicated.

Defendant is morbidly obese, with a body mass index ("BMI") of 44.75 kg/m2.  ECF No. 117-1 at PageID.896.  The CDC defines severe obesity as a BMI of 40 kg/m2 or higher, which "can make you more likely to get very sick from COVID-19" and "[t]he risk of severe illness from COVID-19 increases

sharply with higher BMI." *See* People with Certain Medical Conditions, https://
www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-
medical-conditions.html (last visited December 28, 2022).  The CDC also cites a
2020 study suggesting that "risks of hospitalization, intensive care unit admission,
invasive mechanical ventilation, and death are higher with increasing BMI."  *See*
Obesity, Race/Ethnicity, and COVID-19, https://www.cdc.gov/obesity/data/
obesity-and-covid-19.html (last visited December 28, 2022) (footnote omitted).
And obesity "may triple the risk of hospitalization due to a COVID-19 infection,"
"is linked to impaired immune function," and "decreases lung capacity and reserve
and can make ventilation more difficult."  *See id*. (footnotes omitted).

   Defendant has hypertension, for which she takes medication.  She also
has a serious heart condition.  *See, e.g.*, ECF No. 117-1 at PageID.852, 859, 873,
876; ECF No. 118-2 at PageID.933.  Defendant suffered a heart attack in August
2021, ECF No. 117-1 at PageID.869–72, which was treated and medication
prescribed.  *Id*.  Defendant asserts that her heart condition has worsened, noting
that EKGs taken on November 8 and 9, 2022, were abnormal, showing "atrial
fibrillation versus atrial flutters."  ECF No. 122 at PageID.989.  Based on these
results, Defendant was scheduled for a cardiology consultation on December 16,
2022.  *Id*. at PageID.990.

On November 17, 2022, before the cardiology consult, Defendant was brought to the emergency room at Desert Valley Hospital for chest pains and dizziness, and then later admitted for further evaluation.  *Id*. at PageID.1048, 1050. She was diagnosed with cardiomegaly ("enlarged heart") and aortic atherosclerosis ("hardening of the arteries").  *Id*. at PageID.1059.  The following day, Defendant was scheduled for an angiogram (which provides an image of the heart and its blood vessels).  *Id*. at PageID.1035.  The angiogram revealed a 90% stenosis (blockage) in the right coronary artery, for which Defendant underwent an emergency angioplasty to remove the blockage.  ECF No. 127 at PageID.1079. After a successful surgery, and with no new complaints, chest pain, or shortness of breath, Defendant was discharged on November 19, 2022.  *Id*. at PageID.1083.

The CDC notes that heart conditions, including hypertension, "can make you more likely to get severely ill from COVID-19."  *See* People with Certain Medical Conditions, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited December 28, 2022).  The American Heart Association echoes that "older people with coronary heart disease or high blood pressure are more likely to develop more severe symptoms" as well as "face an increased risk for complications if they become infected with the COVID-19 virus."  *See* Coronavirus precautions for patients and others facing higher risks, https://www.heart.org/en/coronavirus/coronavirus-

15

covid-19-resources/coronavirus-precautions-for-patients-and-others-facing-higher-risks (last visited December 28, 2022).  Also, those with "compromised immune systems, chronic lung diseases and other underlying conditions also may be at risk of more severe illness, according to the CDC."  *Id.*

Defendant has cerebrovascular disease, and in June 2022, underwent a right carotid endarterectomy due to over 80% blockage in that major artery.  ECF No. 117-1 at PageID.884, PageID.889.  The CDC advises that having cerebrovascular disease, which affects blood flow to the brain and may cause a stroke, can make you more likely to get very sick from COVID-19.  *See* People with Certain Medical Conditions, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html/#Actions (last visited December 28, 2022).  For purposes of this Order, the court assumes that Defendant's underlying hypertension, heart condition, cerebrovascular disease, and morbid obesity places her at increased risk of severe illness should she contract COVID-19.

Defendant has sleep apnea, for which she utilizes a continuous positive airway pressure ("CPAP") machine.  *See, e.g*., ECF No. 117-1 at PageID.876.  Sleep apnea is not, however, specified by the CDC as a COVID-19 risk factor.  *See* People with Certain Medical Conditions, https://www.cdc.gov/

16

coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited December 28, 2022).

Defendant has stage 3 kidney disease (or chronic kidney disease, "CKD"). *See* ECF No. 117-1 at PageID.857. Nurse Carter advised in March 2022 that Defendant's kidney functions should be checked again in one month and to follow up with nephrology if they show further decline. *Id*. at PageID.877. The medical records do not show any follow-up or worsening of this condition. The CDC advises that having CKD of any stage can make you more likely to get very sick from COVID-19. *See* People with Certain Medical Conditions, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited December 28, 2022). Notwithstanding, the National Kidney Foundation underscores that "[w]hile more research is needed to learn more about the effectiveness in people with advanced CKD, those on dialysis, and transplant recipients -- these vaccines have been demonstrated to be safe in this population." *See* COVID-19 vaccine and treatments for people with kidney disease, https://www.kidney.org/coronavirus/vaccines-kidney-disease (last visited December 28, 2022).

Defendant takes medication for anxiety and major depression, which affects her ability to sleep and function independently during the day. *See* ECF No. 117-1 at PageID.852, PageID.857; *see also id*. at PageID.876. Stressful events

also seem to exacerbate her anxiety.  *Id*. at PageID.853.  The CDC—and this court—acknowledges that COVID-19 has caused an inordinate amount of stress on everyone.  According to the CDC, stress from the pandemic can cause "changes in appetite" and "worsening of chronic health problems and mental health conditions."  *See* Coping with Stress, https://www.cdc.gov/mentalhealth/stress-coping/cope-with-stress/index.html (last visited December 28, 2022).  Addressing more serious mental health conditions, the CDC advises that mood disorders, depression, and schizophrenia spectrum disorders can increase the chances of becoming "severely ill" from COVID-19.  *See* People with Certain Medical Conditions, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited December 28, 2022); *see also* Digital Shareables on Coping with COVID-19, https://www.nimh.nih.gov/get-involved/digital-shareables/shareable-resources-on-coping-with-covid-19 (last visited December 28, 2022).  Defendant has been advised at her designated facility "how to obtain mental health care" and she has been able to obtain medication for many of her health conditions.  *See* ECF No. 118-2.

At sentencing, the court took Defendant's medical conditions in account, recognized that they require ongoing care, and that the BOP could medically care for her.  ECF No. 57 at PageID.456–57, PageID.465.  In particular, the court acknowledged Defendant's ITP and how it contributes to her fatigue and

inability to sleep, as well as her anxiety and depression. *Id*. at PageID.470. The court could not foresee at the time that she would experience further manifestation of coronary artery disease while incarcerated. However, once at VIM, BOP Health Services acknowledged receipt of Defendant's medical records documenting the right carotid endarterectomy, noted her current medical conditions, continued her prescribed medications, and instructed her "how to obtain medical, dental, and mental health care." ECF No. 118-2 at PageID.937. And it appears from the medical records—i.e., Defendant's presentation to the emergency room and subsequent angioplasty in November 2022—that she can receive appropriate medical treatment while incarcerated. *See* ECF No. 127 at PageID.1081, 1083.

In fact, as part of her admission into VIM, Defendant's health conditions were noted and she was classified at Care Level 1 for Mental Health Reasons and Care Level 2 for Chronic Care. *See* ECF No. 128-2. The four-level classifications are derived from BOP Clinical Guidance for Care Level Classification for Mental Health Conditions or Disabilities and are used to "match inmate health care needs (particularly in terms of intensity of care issues, access to community medical resources, and functional criteria) with institutions that can meet those needs." ECF No. 128-3 at PageID.1124. "Inmate care levels are determined by their medical and/or mental health needs and are based primarily on the chronicity, complexity, intensity, and frequency of interventions and services

19

that are required, as well as an inmate's functional capability." *Id*.  The Care Level

1 designation (for Defendant's mental health) is described as follows:  "[I]nmates

are less than 70 years of age and are generally healthy"; and "[t]hey may have

limited medical needs that can be easily managed by clinician evaluations every 6–

12 months." *Id*. at PageID.1125.  Care Level 2 (for Defendant's other health

conditions) has the following criteria: "[I]nmates are stable outpatients who require

clinician evaluations monthly to every 6 months"; "[t]heir medical and mental

health conditions can be managed through routine, regularly scheduled

appointments with clinicians for monitoring"; and "[e]nhanced medical resources,

such as consultation or evaluation by medical specialists, may be required from

time to time." *Id*.  Care Levels 1 and 2 are based primarily on information

contained in the presentence investigation report ("PSR").  *Id*.  The court

recognizes that Defendant's health care needs may change.  But based on the

record, at this time, the court finds no extraordinary and compelling circumstances

warranting a reduced sentence.  *See United States v. Korn*, 2020 WL 1808213, at

*4, 6 (W.D. N.Y. April 9, 2020) (finding no material change since sentencing in

inmate's coronary artery disease, 16 stents, seven surgical procedures, and three

bypass grants and determining that the BOP was capable of treating him in denying

compassionate release).

## C.  Section 3553(a) Factors

The court independently denies Defendant's Motion to Reduce

Sentence based on a consideration of the applicable 18 U.S.C. § 3553(a) factors.

Those factors include, but are not limited to: (1) "the nature and circumstances of

the offense and the history and characteristics of the defendant"; and (2) "the need

for the sentence imposed . . . (A) to reflect the seriousness of the offense, to

promote respect for the law, and to provide just punishment for the offense; (B) to

afford adequate deterrence to criminal conduct; (C) to protect the public from

further crimes of the defendant; and (D) to provide the defendant with needed

educational or vocational training, medical care, or other correctional treatment in

the most effective manner."  18 U.S.C. § 3553(a)(1)–(2).  And, under the

parsimony clause, the court must "impose a sentence sufficient, but not greater

than necessary, to comply with the purposes set forth" in § 3553(a)(2).  18 U.S.C.

§ 3553(a).

Defendant pled guilty to one count of Conspiracy to Defraud the

IRS and to Commit Money Laundering in violation of 18 U.S.C. § 371, in

exchange for the dismissal of Counts 1 through 9, 17, and 18 of the Superseding

Indictment in Crim. No. 16-00749 JMS-RT-2.  ECF No. 14 (Memorandum of Plea

Agreement, "MOPA"); *see also* ECF No. 38 at PageID.305 (PSR ¶ 48).

Defendant's total offense level was 26, Criminal History Category I, with an

21

advisory guideline range of 63 to 78 months, ECF No. 38 at PageID.314 (PSR ¶ 101).

Defendant's conviction arose out of her involvement in Koyo USA Corporation ("Koyo"), a subsidiary of a Japanese entity that manufactured and distributed bottled water.  ECF No. 38 at PageID.295 (PSR ¶ 10).  Defendant, along with her husband Steve Edwards, conspired with two Koyo employees to defraud Koyo out of millions of dollars.  Specifically, Defendant and her husband operated various manufacturing/supply companies ("vendor companies"), which were owned by co-conspirators.  *Id*. at PageID.296.  The vendor companies, which were run out of the Edwards' home, were not legitimate in any way, but instead acted as "resellers" of products purchased from legitimate vendors, and then sold to Koyo at a greatly inflated price.  When communicating with Koyo employees on behalf of the vendor companies, Defendant used an alias such as "Julie" or "Misty."  *Id*.

As an example, from 2004 through 2014, Berkeley Plastics sold $10,801,415 in water bottle labels to Koyo.  *Id*. at PageID.297.  Defendant registered Berkeley Plastics to do business in California in 2004, and she held the roles of President, Vice President, Treasurer and Secretary.  *Id*.  Defendant provided fraudulent invoices for the sale of labels to Koyo under the name "ITW Auto-Sleeve dba Berkeley Plastics, Inc.," even though Berkeley Plastics had no

22

affiliation with ITW Auto-Sleeve, a legitimate business that manufactured labels. *Id.* In short, Berkeley Plastics was a pass-through company that purchased labels from third parties and then sold them to Koyo at inflated prices. *Id.* Berkeley Plastics overcharged Koyo an estimated amount in excess of $6,000,000, compared to labels Koyo purchased directly from a legitimate label manufacturer. *Id.* at PageID.300.

Defendant and her husband also failed to pay income taxes on the Berkeley Plastic income. *Id.* at PageID.301. For the tax years 2004–2014, Berkeley Plastics had unreported income of $3,733,166, with taxes owing of $1,342,887, and for the tax years 2009–2013, the Edwards had unreported income of $502,864 with taxes owing of $128,226. *Id.* at PageID.301–02.

At her sentencing hearing, Defendant greatly minimized her responsibility. She stated that she "just tried to help people, and unfortunately, I got involved in a situation that was misrepresented to me. It kind of make me look like a person that I'm not." ECF No. 57 at PageID.463. And in a letter provided to the court, Defendant wrote that had "I any indication of the job I took with Berkeley Plastics, Inc. would have involved in anything wrong, I would never have taken the job." ECF No. 29-4.

Although Defendant's husband received a sentence of 36 months of incarceration, ECF No. 51 at PageID.375, the 30 months incarceration imposed

23

upon Defendant for the same conduct, albeit in different roles, largely reflects

Defendant's health issues and is well below the guidelines range. ECF No. 57 at

PageID.470–74. To date, Defendant has served just over three months of her 30-

month sentence, and with a projected release date of November 7, 2024, she has

nearly 23 months of incarceration remaining.[5]

      The court also recognizes that Defendant did not commit a crime of

violence, that she has no criminal history, no substance abuse history, did well

under pretrial supervision, has community support, and, as set forth above, has

serious health issues. Nonetheless, considering all the § 3553(a) factors and taking

into account the time remaining on Defendant's sentence, reducing her sentence

would severely undermine the goals of sentencing set forth in § 3553(a)(2). The

court thus determines that it would deny Defendant's motion on the § 3553(a)

factors alone.

\\

\\

\\

\\

---

[5] When evaluating the § 3553(a) factors, courts consider the amount of time remaining on a defendant's sentence—whether short or long—in determining whether to grant compassionate release. *See, e.g.*, *United States v. Pawlowski*, 967 F.3d 327, 330–31 (3d Cir. 2020); *United States v. Chambliss*, 948 F.3d 691, 694 (5th Cir. 2020); *United States v. Maka*, 2020 WL 2544408, at *4 (D. Haw. May 19, 2020); *United States v. Bogdanoff*, 459 F. Supp. 3d 653, 659 (E.D. Pa. 2020).

## IV.  **CONCLUSION**

For the foregoing reasons, Defendant's Second Compassionate

Release Motion, ECF No. 113, is DENIED WITHOUT PREJUDICE.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, December 28, 2022.



　　　　　　　　　　　　　　 /s/ J. Michael Seabright　　
　　　　　　　　　　　　　　J. Michael Seabright
　　　　　　　　　　　　　　United States District Judge

*United States of America v. Melanie Edwards (02),* Crim. No. 19-00038 JMS (02), Order
Denying Defendant's Second Motion to Reduce Sentence Pursuant to 18 U.S.C.
§ 3582(c)(1)(A)(i), ECF No. 113